# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DANIELLE MILLER,**

    **Plaintiff,**

**vs.**             **Case No.: 8:10-cv-2475-RAL-TBM**

**ROCHE SURETY AND CASUALTY CO.,
INC., ROCHE BAIL BONDS, INC. and
SHANNON ROCHE,**

    **Defendants.**
_____/

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Defendants, Roche Surety and Casualty Co., Inc. ("Roche Surety"), Roche Bail Bonds, Inc. ("Roche Bail") and Shannon Roche ("Roche"), (collectively the "Defendants"), move pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 3.01(a) for summary judgment in their favor on both counts of the amended complaint filed by the Plaintiff, Danielle Miller ("Miller"). The grounds for this motion, which are more fully described in the memorandum which follows, are that there is no genuine issue of material fact and as a matter of law the Plaintiff has not proven that any or all of the Defendants violated 29 U.S.C. § 207(r)(1) by refusing to provide the Plaintiff with a reasonable break time to express breast milk or a suitable place in which to perform that act, or that any or all of the Defendants violated 29 U.S.C. § 215(a)(3) by discriminating against the Plaintiff because she filed a complaint relating to the Fair Labor Standards Act ("FLSA").

<u>MEMORANDUM OF LAW</u>

**I.    PROCEDURAL BACKGROUND**

Section 207(r)(1) of the FLSA, which was enacted as a largely unpublicized and little

noted part of the Affordable Health Care Act ("AHCA"), took effect on March 23, 2010.  In

its entirety, the relevant portion of the AHCA added the following to the FLSA:

(r)(1)  An employer shall provide—

(A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and

(B)  a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

(2)  An employer shall not be required to compensate an employee receiving reasonable break time under paragraph (1) for any work time spent for such purpose.

(3)   An employer that employs less than 50 employees shall not be subject to the requirements of this subsection, if such requirements would impose an undue hardship by causing the employer significant difficulty or expense when considered in relation to the size, financial resources, nature, or structure of the employer's business.

(4)  Nothing in this subsection shall preempt a State law that provides greater protections to employees than the protections provided for under this subsection.

The law left much unsaid.  It does not define what was a reasonable break or "a

place."  It did not explain whether a "bathroom" was intended to describe a room different

than a restroom, or a locker room.  And it did not treat in any way the process by which an

employer would become aware of the employee's need for time or place.  On December 21,

2010, the United States Department of Labor ("DOL") published a request for public

information regarding the new law, establishing a deadline of February 22, 2011, for receipt of comments. Reasonable Break Time for Nursing Mothers, Vol. 75, No. 244 Fed. Reg. 80073-74 (Dec. 21, 2010). In its request, the DOL stated that it "does not plan to issue regulations implementing this provision," because the regulations would not be "the most useful or effective means for providing initial guidance to employers and employees, [but if] the Department determines that regulations are necessary, it will initiate rulemaking at that time." *Id*. at 80073. As of this date, the DOL has not published the content of any comments which were in fact received nor has it promulgated any regulations interpreting the law.[1]

Miller quit her employment with Roche Surety and Roche Bail on September 7, 2010, approximately two months after publication of the original DOL Fact Sheet #73, and approximately three months before publication of the request for public information. Miller filed her two-count complaint on November 5, 2010. (Dkt. 1). She filed an amended complaint on November 15, 2010.[2] (Dkt. 6). In count I of the amended pleading, Miller alleges that she engaged in "protected activity" under the FLSA, which she does not describe, and was retaliated against when she was terminated or constructively discharged from her employment.[3] (*Id*. at ¶¶ 22-25). In count II, Miller alleges that the Defendants failed to provide her with a reasonable break time and/or statutorily required location to express breast milk at work. (*Id*. at ¶¶ 26-29). The Court should grant summary judgment in favor of the Defendants because Miller has failed to establish either claim.

---

[1] The DOL published WHD Fact Sheet #73: Break Time for Nursing Mothers under the FLSA, in July of 2010 and a revised version in December of 2010, both of which are attached to this motion.
[2] Citations to the record will be made by identifying the record source followed by the reference paragraph, page number, or exhibit number—for example: (Miller at 1).
[3] The only changes the Plaintiff made from the original complaint to the amended complaint are the addition of the words "or constructively discharged" after the word "terminated."

## II.   STATEMENT OF DISPUTED FACTS[4]

Roche Surety, Inc.,[5] Roche Surety and Roche Bail are family-owned entities engaged in the bail bond business. (A. Roche at 4, 19, 52), (Diliberto at 14-15, 17, 68-69), (S. Roche at 16-18). Roche Surety, Inc. is a wholesaler of bail bonds and the managing general agent of Roche Surety. (A. Roche at 4), (Diliberto at 15), (S. Roche at 14, 17-18). Roche Surety is an insurance company underwriting bail bonds for bail bond agents operating throughout the United States.[6] (A. Roche at 4, 19), (Diliberto at 15), (S. Roche at 17-18, 38), (Miller at 19-20, 58), (Meyer at 5-6, 24). Roche Bail is the bail bond retailer (the bail bond "agency") that writes bail bonds. (A. Roche at 4, 37), (Diliberto at 15, 42-43), (S. Roche at 17-18), (Miller at 28). Roche Surety performed the human resources function for Roche Bail and provided coverage for Roche Bail's office when that company's one employee was absent from that office. (Diliberto at 11, 42-43), (S. Roche at 7-8), (Miller at 28).

### A.   Miller's Employment at Roche Surety

At the times relevant to this suit, Miller was employed by Roche Surety as a loss prevention specialist monitoring bond forfeitures. (Miller at 15, 24-25, Ex. 2). She had begun her employment in 2004 as a receptionist and became a licensed bail bond agent in 2006. (Miller at 7, 14, 16-17, 19-20). By 2010, Miller was working for Roche Surety from 8:30 a.m. to 5:30 p.m., Monday through Friday. (Miller at 24, 33). She received an unpaid hour-long break for lunch and two paid fifteen minute breaks which she could take at times of her

---

[4] The facts recited throughout this motion for summary judgment are presented for purposes of this summary judgment only.  By reciting these facts, the Defendants do not admit any facts not already admitted in the pleadings.  To the contrary, the Defendants deny many of the assertions made by Miller.
[5] Roche Surety, Inc. is not a defendant in this action.
[6] A bail bond agent is a person licensed by a state to issue bail bonds.  These agents are not agents or employees of Roche Surety.  Roche Surety is the insurer of the bail bonds written by these bail bond agents.

own choosing. (Miller at 33-34). Roche Surety was generous in allowing breaks and Miller was permitted to take additional breaks without receiving prior permission from a supervisor as long as she did not abuse the privilege. (Miller at 34, 53), (Martin at 44-45, 52-53), (Diliberto at 66-67), (S. Roche at 92-95, 108), (Winkelman at 22), (Arroyo at 13-14). Breaks were never timed and Miller was never criticized or disciplined for taking too many, or too long, breaks. (Miller at 34, 53-54), (Martin at 44-45, 52-53, 55-57), (Winkelman at 22-23).

Miller was assigned her own office, which had a door that had a push-in interior lock. (Miller at 34-35, 43-44, 46), (Martin at 15-16, 49). The office had two windows: an interior sidelight adjacent to the office door and an exterior window that faced a parking lot. (Miller at 34-36). The sidelight was some two feet wide, as tall as the door and had no blinds or shades. (Miller at 34-36). The exterior window had vertical blinds which completely blocked the view from outside into the office when closed. (Miller at 34-36).

Although Miller spent the vast majority of her time working at the Roche Surety building, one day a month she worked a day shift at the Roche Bail building when there was a need for additional bail bond agents or to allow time off for the Roche Bail employee. (Miller at 18, 22-28). During these shifts Miller was considered and treated as an employee of Roche Surety. (Miller at 24-27), (Diliberto at 42-43). Miller was paid by Roche Surety for this time and she would still receive an hour break for lunch and two fifteen minute discretionary breaks. (Miller at 24), (Diliberto at 66-67), (Meehan at 13). The Roche Surety and Roche Bail buildings were approximately a minute and a half walk from each other and Miller could leave Roche Bail during her breaks, without asking a supervisor, as long as there was coverage, which she could obtain on request. (Diliberto at 66-67), (Miller at 16,

68), (Winkelman at 15, 17), (Meehan at 8-9, 13-14), (Arroyo at 13-14).

**B.     Danielle Miller Bail Bonds**

Miller also worked at Roche Bail on Wednesday nights from 5:00 p.m. to 10:00 p.m., executing bail bonds as Danielle Miller Bail Bonds, her sole proprietorship, and paying Roche Bail a percentage of her sales. (Miller at 16-17, 20-22, 25, 29-30, Ex. 3), (Diliberto at 43). In this situation she was like any other licensed bail bond agent using Roche Surety as her insurer. She was neither an employee nor an independent contractor of Roche Surety or any other entity except Danielle Miller Bail Bonds. In fact, she would pay Roche Surety a premium for insurance written on bail bonds which she wrote and charged for. During these times, Miller was often the only person on site and had complete control over her own time and efforts. (Miller at 68-69). Miller would have to leave the office in order to deliver a bond and could leave to purchase a meal. At such times she could lock the building. (Miller at 69, 72). Additionally, at any time, Miller could lock the building. (Winkelman at 18), (Meehan at 13). Persons wishing to get enter the building could ring a door bell. The person inside could observe the person on video camera and allow them entry if she so chose. (Martin at 51-52).

The Roche Bail building is a double-wide trailer with an open office area, a waiting room, two closed offices,[7] a file room, a kitchen and a restroom. (Miller at 16, 30-33). The outside, open office area and waiting room were video monitored for safety purposes.[8] (A. Roche at 39-42), (Diliberto at 61-62), (Meehan at 15-16). The two offices[9] and file room

---

[7] One of the offices is also referred to as a storage room. (Winkelman at 18-19), (Meehan at 16-17).
[8] Miller claims all the rooms were video monitored and one room was always locked. (Miller at 32, 50-52). The video monitor system, however, showed which rooms were monitored and the key to the room that was allegedly always locked was available if needed. (A. Roche at 36-37, 41-42), (Martin at 51-52).
[9] There is a two way mirror between the waiting room and one of the offices, but the waiting room had a sliding door that could be closed and the window could be covered if requested. (Miller at 30-31), (S. Roche at 110).

were not video monitored and had doors and locks.  (A. Roche at 36-37, 39-41), (S. Roche at 88-90, 110-12), (Martin at 30, 51-52), (Winkelman at 17-19), (Meehan, 7, 16-17).

### C.      Miller Resigned after Returning from Maternity Leave

On June 17, 2010, Miller gave birth to her first child after having been afforded approximately eleven weeks of paid time off work for maternity leave.[10] (Miller at 4, 29, 37-38). Neither Roche Surety nor Roche Bail, individually or collectively, is subject to the Family Medical Leave Act and so Miller had no right to any leave during her pregnancy. (Diliberto at 19-21), (S. Roche at 7-9, 23, 91). Nevertheless, Roche Surety did provide such leave and even allowed Miller to take additional time beyond the six weeks of paid time off. (Diliberto at 19-21), (S. Roche at 23, 91).

Before she returned to work, Miller visited the workplace to show off her son and during that visit spoke to Shannon Roche, co-owner and president of Roche Surety. (Miller at 36-37), (S. Roche at 6-7, 16). Miller told Roche, who recently had delivered her own baby, that she (Miller) planned to breastfeed her child until he was one year old. (Miller at 36-37), (S. Roche at 58-60, 124). Miller did not tell Roche she would need to pump at work nor did she make any request for a place or additional break times to pump. (S. Roche at 13, 83).

Miller returned to work on August 23rd. (Miller at 38). Miller was not enthusiastic about returning to work and she openly expressed her desire to be a stay-at-home mom. (Diliberto at 24-25, 39, 46), (Meyer Aff. ¶ 7), (Winkelman at 5, 7-8), (Meehan at 11), (S. Roche at 58). On her first day back, Miller, without informing anyone she planned on pumping or of any needs she may have with respect to that practice, placed manila folders

---

[10] Miller discussed the possibility of leaving Roche Surety prior to her maternity leave. (Carrozza Aff. ¶¶ 5-6).

over her office sidelight. (Miller at 38-42), (Martin at 14-16, 23-24, 40, 57-58), (Diliberto at 40), (S. Roche at 13, 82-83, 91). The folders covered the majority of the window but Miller stopped at her knees because she "was over it." (Miller at 39-41). The folders afforded Miller privacy to pump in her office and they remained up for the rest of time she worked at Roche Surety, without complaint or adverse consequences. (Miller at 39-40).

Miller alleges that after she was finished covering her window, Melissa Martin, her supervisor at Roche Surety, asked her why there were manila folders on her window.[11] (Miller at 38-39, 42, 49), (Martin at 12, 14-15, 23-24, 40, 57-58), (S. Roche at 12, 24). Miller told Martin that she covered the window because she needed privacy in order to pump and that she was not going to spend any money to purchase window treatments for her office.[12] (Miller at 42-43). The conversation ended at this time and Miller did not request additional break times or another place to express breast milk. (Miller at 39, 42-43, 49). Miller was not criticized or disciplined for having covered the sidelight. In fact, Miller had been known to decorate the sidelight, in seasonal and other themes, before. (Arroyo at 7-8).

Miller used her office to pump without incident except for two occurrences to be discussed. (Miller at 43, 87). She pumped two times during the work day, taking approximately ten minutes each time for the process. (Miller at 54, 71). Additionally, Miller used her lunch break to visit her child, who attended a day care facility close to his mother's work. (Miller at 52-53). As a result, Miller sometimes overstayed her lunch by five to ten minutes visiting her son, but was never criticized or disciplined by Roche Surety for the extra

---

[11] Martin does not recall ever having this or any discussion regarding pumping. (Martin at 14-15, 40, 57-58).

[12] In her answers to interrogatories, Miller alleges she requested the Defendants place window treatment on her office window but the Defendants refused. (Pl. Resp. to Def. Interrog. ¶ 4). Miller, however, admits she covered her window prior to speaking with anyone and it was Martin who asked her why she did not purchase treatment. (Miller at 39, 42). Miller does not allege she ever asked Martin to purchase window treatment. (Miller at 42).

time, even though it impacted her co-worker on at least one occasion. (Miller at 53-54), (Winkelman at 22-23, 26), (Martin at 55-57).

Miller alleges that during her first week back at work, Sam Marcadis, an employee at Roche Surety, walked in to her office while she was pumping with her back to the door. (Miller at 44), (Marcadis Aff. ¶¶ 4-5).[13] According to Miller her office door was closed and locked, but Marcadis, without knocking, was able to walk right in.[14] (Miller at 44-45, 77, 80). Prior to her return to work, Marcadis had often walked in to Miller's office unannounced and there was no sign on her door that would have put Marcadis or anyone else on notice that she was pumping. (Miller at 45-46). Marcadis immediately apologized and Miller spoke with him later that day to explain that she was pumping. (Miller at 45-47). Miller never mentioned the incident to anyone at Roche Surety nor did she inform Roche Surety that she believed her lock was not working properly. (Miller at 49, 61), (Martin at 15-16, 58-59), (Diliberto at 40), (S. Roche at 83). In fact, Miller continued to pump in her office and did not think it was necessary to put a sign on her door to prevent other people from disturbing her. (Miller at 46, 48, 87), (Arroyo at 10-11).  Marcadis did not intrude on Miller again.

On August 25th, Miller (as Danielle Miller Bail Bonds) worked as a bail bond agent at Roche Bail. (Miller at 50).  Miller did not inform anyone at Roche Bail that she planned to pump or that she had concerns about the building's video monitoring system. (Miller at 43, 50-52). Instead, Miller locked the Roche Bail building when there were no clients and decided to pump in the bathroom, even though there was no one else in the building. (Miller at 50-52, 55-56, 70-71). Miller could have walked the short distance to the Roche Surety

---

[13] Marcadis denies ever walking in on Miller pumping in her office. (Marcadis Aff. ¶¶ 4-5).
[14] Miller thought her lock worked because it locked when she tested it. (Miller at 44, 46, 48-49, 77, 80).

building and used her office but decided against it because it was night time and the buildings are close to the jail. (Miller at 69). Miller also could have used the two offices and the file room that were not video monitored.  (S. Roche at 88-90, 110-12), (Meehan at 15-17). Miller was "fine" with pumping in the bathroom and did not bring it to Roche Bail's attention. (Miller at 52, 56, 61, 70-71, 80).

Stephen Spiro, Miller's husband, was apparently upset about Miller pumping in the bathroom, placing manila folders on her sidelight, and being walked in on by Marcadis, so he began actively soliciting new job opportunities for her. (Miller at 4, 7, 76, 79-80, Ex. 8). Apparently, neither he nor Miller entertained the thought of asking for the allegedly non-functioning lock to be repaired. (Miller at 48-49). Spiro "knew" Miller was unhappy because, despite not informing Roche Surety or Roche Bail about the things that were allegedly bothering her, she believed she was not being treated well.[15] (Miller at 41, 43, 48-49, 61, 76-77, 87), (Diliberto at 40), (S. Roche at 13, 25, 82-83), (Martin at 14-15, 34, 40, 49, 58-59).

On September 1st, Spiro asked Miller to send him her resume. (Miller at 75-77, Ex. 8 Bates stamp 89). That afternoon, Spiro sent James Bemis, a co-worker of his, a copy of Miller's employment agreement with Roche Surety, which contained a provision restricting competition. (Miller at 77-78, Ex. 8 Bates stamp 88). Copying Miller, Spiro informed Bemis that Miller did not have a customer base but that she was looking to work for another bail bond agency rather than starting her own. (Miller at 77-78, Ex. 8 Bates stamp 87-88). Spiro asked Miller if Donald Golden, an attorney who handled her personal bankruptcy, could review her employment agreement, which contained a restriction on competition. (Miller at

---

[15] Miller did not complain to coworkers or anyone else at work about problems expressing breast milk at work. (Meehan at 13), (Winkelman at 7-8).

78-79, Ex. 8 Bates stamp 86-87).  Miller says she wanted Spiro to "drop the issue" because she was not interested in leaving, but, instead of telling Spiro that, responded to him that she would email Golden and get his opinion. (Miller at 78-80, Ex. 8 Bates stamp 86-87).

That evening, Miller again worked as Danielle Miller Bail Bonds at Roche Bail. (Miller at 55).  Again, Miller did not notify anyone that she would be pumping, nor did she make any requests for a break time or place to pump. (Miller at 55). Again, Miller locked the Roche Bail building and pumped in the bathroom, even though she was the only person in the office and was able and allowed to lock it. (Miller at 55-56, 69-71). Miller only told her husband about this incident. (Miller at 55-56, 61, 70-71).

Early the next morning, September 2nd, Spiro sent an email to Michael Molinari, an employee at Ditek Corp, asking whether he, or anyone he knew, was looking for administrative or office manager help because Miller "need[ed] a new job bad." (Miller at 82, Ex. 8 Bates number 83). Spiro wanted Miller to leave and informed her in an email that he was going to be soliciting positions for her. (Miller at 81-84, Ex. 8 Bates stamp 85). Miller responded "Cool . . . so over this," and that her co-worker Jeannette Winklemann had just given her a "hard time" (about something unrelated to her expressing needs). (Miller at 81-83, 87, Ex. 8 Bates stamp 85-86). Spiro responded he would get a second job and she should "Just leave." (Miller at 82-83, Ex. 8 Bates stamp 84). "I'd rather you be happy with [son] and poor then you going to work miserable. We need you happy!" (Miller at 81-82, Ex. 8 Bates stamp 84). Spiro forwarded a couple more employment leads to Miller. (Miller at 83, Ex. 8 Bates stamp 79-83). That afternoon, Spiro also emailed Miller her updated resume and asked whether there were any other changes she would like him to make. (Miller at 84, Ex. 8 Bates

stamp 78). At this time, Miller had not been denied a break time or place to express breast milk, nor had she made any request or complaint regarding any needs she may have with respect to expressing. (Miller at 43, 87), (S. Roche at 13, 25, 82-83), (Martin at 14-15, 23-24, 26, 40, 58-59).

During Miller's second week back at work, Zaida Arroyo, her co-worker at Roche Surety, walked in to Miller's office, without knocking, while she was pumping milk. (Miller at 47-48, 76), (Arroyo at 7-8, 10-11). Miller had her back to the door at the time and notwithstanding the incident involving Marcadis, did not think it was necessary to put a sign up because she believed she had locked her door properly. (Miller at 47-48), (Arroyo at 10-11). Miller "snapped" at Arroyo who apologized once she realized what Miller was doing. (Miller at 47-48), (Arroyo at 7-9, 11). Despite being the second time Miller was allegedly walked in on by a co-worker, Miller did not inform anyone at Roche Surety about the incidents nor did she tell anyone that she believed her lock was not working properly. (Miller at 47-49), (Martin at 15, 49, 58-59), (Diliberto at 40), (S. Roche at 83). Miller continued to pump in her office and did not place a sign on her door for privacy. (Miller at 46-48, 87).

On the evening of September 6th, Miller posted a comment on Facebook expressing the feeling that she did not wish to go to work. (Miller at 56-57, 59-62, 86, Ex. 4). Miller had been making Facebook posts for about a week about how things were not going well at Roche Surety. (Meyer at 18), (Meyer Aff. ¶¶ 8-9), (Miller at 48-49). The Facebook posts were general negative statements about Roche Surety and did not mention pumping, but they prompted Toni Meyer, a bail bond agent in Idaho who was an insured of Roche Surety, to call Roche Surety because she was worried something serious was going on that may

adversely affect her business.[16] (Meyer at 12-15, 17-19, 21, 23), (Meyer Aff. ¶¶ 8-12), (S. Roche at 33-38, 73-74), (Winkelman at 8-12). Meyer spoke with Winklemann and Roche, both of whom were unaware of Miller's Facebook posts or anything that would have caused Miller to post negative comments, and Meyer read them the Facebook comments.[17] (Meyer at 17-19, 23), (Meyer Aff. ¶¶ 11-12), (S. Roche at 38), (Winkelman at 7-8, 10-13). At this time, Roche decided to monitor Miller's work email. (S. Roche at 33-35, 41), (Martin at 39, 50-51, Ex. 8 Bates stamp 230). She thereby became aware of several pieces of correspondence, including those described herein.

Spiro was pushing for Miller to resign and at 8:51 a.m. on September 7th, he sent her a resignation letter addressed to Roche and dated that day. (Miller at 63, 75, 83, 85, Ex. 5, Ex. 8 Bates number 200016-17). At this time Miller had never made a request for a place or additional break times to pump, nor had she ever been denied a place and time to pump. (Miller at 43, 49, 61, 87), (S. Roche at 13, 22-23, 25, 82-83), (Martin at 14, 23-24, 40).

That morning or early afternoon, Roche called Eddie Diliberto, the controller and the employee responsible for human resources, into her office and asked whether Diliberto knew that Miller was contemplating resigning.[18] (Diliberto at 23-25, 34, 48, 50, 53, 60). Roche showed Diliberto Miller's resignation letter and several items of correspondences between Miller and her husband, and between her and various other individuals regarding resigning and alternative employment opportunities. (Diliberto at 24-26, 29, 33, 53).  Diliberto was also told about comments Miller posted on Facebook denigrating Roche Surety. (Diliberto at

---

[16] The conversation happened before Miller resigned, but the actual date is unknown. (S. Roche at 49, 68).

[17] A copy of the Facebook post was faxed to Shannon Roche but she discarded it before the lawsuit was ever filed.  Miller did not delete her posts, (Miller at 59), but alleges she is only able to retrieve information from her Facebook profile back to December of 2010.

[18] Monica Meythaler, Shannon Roche's executive assistant, was also present. (Diliberto at 24, 26-27, 48, 55).

29, 33-34, 53).   Diliberto agreed to speak with Miller to find out whether she wanted to resign, and took with him the unsigned resignation letter and a letter prepared in case she did resign. (Diliberto at 29, 34-35, 50, 52-53, 55, 60-61, Ex. 8). There was no instruction to Diliberto to terminate Miller. (Diliberto at 34, 58, 60-61, Ex. 8), (S. Roche at 39, 42, 98).

At 1:12 p.m., Roxanne Barton, Miller's friend, asked whether Miller had made it in to work because of a Facebook comment she posted the night before. (Miller at 56-57, Ex. 4). Miller alleges she was at her breaking point and responded that she made it in but was "looking into alternatives" and that "Today could be the day!" (Miller at 49, 56, 61-63, 87, Ex. 4).  In fact, Miller showed Rosa Meehan, her co-worker, the resignation letter and told her she would probably turn it in. (Meehan at 10-11).

Miller was scheduled to work a day shift the following day at the Roche Bail building as an employee of Roche Surety and, at 1:20 p.m., emailed Roche informing her that she would need to pump at least two times during her shift and requested a place other than a bathroom to pump.[19] (Miller at 43, 49-50, 65-66, 70-71, Ex. 6). This was the first contact between Miller and Roche Surety regarding any needs she had with respect to expressing breast milk at work. (Miller at 43), (S. Roche at 13, 22-23), (Martin at 23-24, 40). Miller was hoping someone could watch the Roche Bail building and she would be able to pump in her office at Roche Surety. (Miller at 68-70, Ex. 6). In fact, it was common for employees of Roche Surety working at the Roche Bail office to call over for someone to cover for them when they wanted to take a break.[20] (Diliberto at 67), (Winkelman at 15, 17), (Meehan, 8-9,

---

[19] Miller had her regularly scheduled night shift as Danielle Miller Bail Bonds at Roche Bail that night, too, but admits she was not concerned about pumping during this time. (Miller at 70-71).
[20] Although she never asked, Miller claims it was "understood" she could not lock the Roche Bail building when she worked the day shift as an employee of Roche Surety, and could not take breaks. (Miller at 71-72).

13-14). The email did not contain any expression of a feeling that Roche Surety had denied her a place and time to pump in the past, nor did it say anything about allegedly not being treated well with respect to pumping. (Miller at 43, 49-50, 87, Ex. 6).

Approximately an hour later Miller was assigned to provide phone coverage at the Roche Surety reception area, covering for another employee. (Miller at 66-68), (Diliberto at 73-74). Miller had not heard back from Roche and emailed Barton a copy of Section 4207 of the AHCA, amending the FLSA for Reasonable Break Time for Nursing Mothers, at 2:59 p.m. (Miller at 72-74, Ex. 7). Miller knew the law existed before that day but never sent a copy to Roche Surety. (Miller at 73-74), (S. Roche at 22-24, 46-47, 50), (Diliberto at 51).

Roche, who was sick and had left work for the day, did not make or oversee Miller's schedule and forwarded her email to Diliberto, Martin, and Meythaler at 3:23 p.m. (Diliberto at 22, 43-44, 55-57, Ex. 7), (S. Roche at 12, 24, 63-65, 103, 107-09), (Martin at 23-24, 26, 40). Diliberto and Martin responded back to Roche at 3:26 p.m. and 3:30 p.m., respectively, stating it would not be an issue to provide the requested breaks and place for Miller to pump.[21] (Diliberto at 22, 55, 57, Ex. 7), (Martin at 19).

At approximately 3:30 p.m., Miller asked Diliberto whether he had seen Roche because she had not received a response to her email. (Miller at 67-69), (Diliberto at 22, 54). Diliberto informed Miller that Roche had left and that she should forward him the email. (Miller at 65-68, Ex. 6). At 3:49 p.m. Diliberto replied that they would discuss her request after she was done with her phone coverage. (Miller at 66-67, Ex. 6). Miller was unable to

---

Other Roche Surety employees, however, state it was common to lock the door and that they would take breaks. (Winkelman at 15, 17-18), (Meehan at 13-14), (Martin at 42).

[21] Roche Surety and Roche Bail are family oriented and employees are permitted to bring children to work, without criticism or complaint. (Winkelman at 26-27), (Arroyo at 11-12), (Martin at 56).

find Diliberto when her phone coverage ended at 4:00 p.m.[22] (Miller at 67).

Within the hour, Diliberto and Martin came to Miller's office and asked her whether she wanted to resign. (Diliberto at 27-28, 34, 37, 47, 58, 60). Diliberto asked Miller whether she was happy because her resignation letter had been found and the Defendants were aware of her Facebook comments. (Diliberto at 27-34, 37, 45), (Miller at 63-67, Ex. 5, Ex. 8, Ex. 9), (Pl. Resp. to Def. Interrog. ¶ 11), (Martin at 22-23). Miller told Diliberto and Martin she was not happy under the circumstances and signed her resignation letter. (Miller at 63-66, Ex. 5), (Diliberto at 30-32, 36, 46-47, 59), (Martin at 22-23, 25, 34). The resignation was made effective immediately, which was standard practice for the Defendants, and Miller signed a letter acknowledging her employment had been terminated and agreeing that she would cease posting information on Facebook about the Defendants and its agents. (Miller at 63-66, 86, Ex. 5, Ex. 9), (Diliberto at 31-32, 35-36, 59-61, 65-66, Ex. 8), (Martin at 24-26). Miller does not allege Diliberto or Martin made her resign because she had requested a place and time to express breast milk. In fact, there was no discussion regarding pumping when Miller resigned. (Diliberto at 30-31, 38, 46-47), (Martin at 14, 22-23, 40).

## III.   LEGAL ANALYSIS

The Defendants are entitled to summary judgment in its favor on all claims contained in the amended complaint because Miller has failed to carry her burden of establishing the Defendants: (1) retaliated against her for engaging in activity protected by the FLSA by making her resignation effective immediately; and (2) did not provide her an appropriate place and reasonable break times to express breast milk at work.

---

[22] At 4:11 p.m. Spiro drafted an email for Miller addressed to Shannon Roche and Armando Roche regarding her expressing needs. (Diliberto at 69-71, Ex. 9). The email, however, was never sent.

### A.        Miller was not retaliated against for engaging in protected activity

The Defendants did not retaliate against Miller for engaging in protected activity when it made her signed resignation letter effective immediately after it was brought to the Defendants' attention that she had been posting negative comments regarding the Defendants on Facebook and had been planning on resigning.  The retaliation prong of the FLSA "prohibits an employer from 'discharging or in any other manner discriminating against' an employee because the employee has opposed or complained about a practice that is unlawful under the" FLSA. *Bythewood v. Unisource Worldwide, Inc.*, 413 F. Supp. 2d 1367, 1372 (N.D. Ga. 2006) (citations omitted). Miller bears the burden of establishing: "(1) she engaged in activity protected under the [FLSA]; (2) she subsequently suffered adverse action by the [Defendants]; and (3) a causal connection existed between [Miller's] activity and the adverse action." *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342-43 (11th Cir. 2000) (citations omitted). If Miller is able to establish her prima facie case, the burden of production, not proof, shifts to the Defendants to proffer a legitimate, non-retaliatory reason for the action. *See id.* at 1343; *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 822 (11th Cir. 2008). Miller bears the ultimate burden of production and persuasion to establish the proffered reason is pretext for unlawful retaliation. *See Wolf*, 200 F.3d at 1234; *Raspanti*, 266 F. App'x at 822. Because Miller cannot meet her burden of establishing a prima facie case and rebutting the legitimate, non-retaliatory reason, the Defendants are entitled to summary judgment.

### 1.        Miller did not engage in activity protected by the FLSA

To engage in "protected activity," Miller must "file (or threaten to file) an action adverse to the [Defendants], actively assist other employees in asserting FLSA rights, or

otherwise engage in activities that reasonably could be perceived as directed towards assertion of rights protected by the FLSA." *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996); *see also Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102-03 (1st Cir. 2004) (stating to engage in protected activity the plaintiff must go beyond mere "abstract grumblings" and take some action that is adverse to the employer). Although Miller requested a time and place to express breast milk, her September 7th email did not make any mention that she believed the Defendants were violating the FLSA or that she planned to take some action adverse to the Defendants. Accordingly, Miller's vague statements were not a complaint and are insufficient to show she asserted rights protected by the FLSA. *See Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1373-74 (S.D. Fla. 2009) (granting summary judgment in favor of the employer and finding plaintiff did not engage in protected activity for purposes of retaliation because "nowhere in the plaintiff's vague statements to management," in which the plaintiff complained about including the sushi bar in the tip pool, "does the plaintiff assert her rights under the FLSA"); *see also Etienne v. Muvico Theaters, Inc.*, 2003 WL 21184268, *18 (S.D. Fla. 2003) (finding the plaintiff did not engage in protected activity because he did not present "evidence that he threatened to report labor-law violations, or file a complaint about business practices" of the employer).

Even if Miller can show her email was an assertion of rights, the Defendants are still entitled to summary judgment because "not all informal assertions of rights protected by the FLSA constitute protected activity." *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1134 (N.D. Ga. 2004). Rather, Miller must establish that she subjectively believed the Defendants were engaged in unlawful employment actions, and this belief must be

"objectively reasonable in light of the facts and record presented." *Id.* (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)); *Bythewood*, 413 F. Supp. 2d at 1373 (same); *see also Clover v. Total System Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (stating to engage in protected activity the plaintiff must have a "good faith, reasonable belief" that the defendant's conduct is unlawful).

Miller did not have a good faith, objectively reasonable belief that she was complaining of unlawful conduct because the first and only time she informed the Defendants of any needs with respect to expressing breast milk at work was in the September 7th email and it is undisputed at the time Miller had never been denied a reasonable break time to express breast milk, nor had she been denied an appropriate place. Indeed, Miller was able to pump in her office, the place she admits she was hoping to use, the entire time she returned from maternity leave without having to make a formal request. Moreover, the only time Miller worked a day shift at the Roche Bail building as an employee of Roche Surety she admits she did not have to pump. (Miller at 49-50). She also admits was not concerned about pumping when she worked as Danielle Miller Bail Bonds. (Miller at 70-71).

### 2.   Miller did not suffer an adverse employment action after asserting rights protected under the FLSA

Additionally, Miller cannot establish that she suffered an adverse employment action after an assertion of FLSA rights because Miller's one-time request for a time and place to express breast milk was "too indefinite" to meet her burden. *See Wolf*, 200 F.3d at 1339, 1343 (holding a one-time assertion by appellant's counsel that appellant had claims under the FLSA or Wage Labor Hour was "too indefinite" to meet the appellant's burden that she asserted rights protected under the FLSA prior to her termination two weeks later).

Moreover, Miller did not actually suffer an adverse action because she resigned and she cannot show the conditions "were so intolerable a reasonable person would have felt compelled to resign rather than" remain employed. *See Burnette*, 342 F. Supp. 2d at 1138-39.

Indeed, although Miller alleges she was at her breaking point because of the things that were occurring at work, she never informed the Defendants that she would need window treatment, that her lock did not work properly or that Marcadis and Arroyo walked in to her office while she was expressing milk. A reasonable person would not find the conditions were so intolerable and yet continue to pump at work without so much as informing the Defendants or placing a sign on her door for privacy.

Moreover, Miller cannot show Roche's failure to immediately respond to her email was so intolerable that it caused her to resign because Roche had left for the day and Diliberto responded they could discuss the email after her phone coverage. Although Miller claims Diliberto knew why she was unhappy, the only discussion they had earlier that day was about the email, not her pumping needs or reasons she was unhappy.

### 3. Miller cannot show her alleged assertion of rights was the "but for" cause of the alleged adverse action

Miller has also failed to establish that the alleged adverse action would not have occurred "but for" Miller's alleged assertion of FLSA rights. *Wolf*, 200 F.3d at 1343. Indeed, Miller admits Diliberto and Martin approached her because of her resignation letter and comments made on Facebook, and alleges these were the reasons for her termination or constructive discharge. The Facebook comments were posted, and the resignation letter was drafted, prior to Miller ever allegedly asserting any rights under the FLSA and neither of these things had anything to do with her assertion of rights. Moreover, Diliberto and Martin

did not discuss with Miller her email request when Miller decided to resign.

**4.      Miller cannot Rebut the Defendants' Legitimate Non-Retaliatory Reason for Making her Resignation Effective Immediately**

The Defendants made Miller's signed resignation letter effective immediately, which was the standard practice for the Defendants, after she was approached because of her resignation letter, emails regarding resigning and alternative employment, and negative comments made on Facebook about the Defendants. Because these reasons would motivate a reasonable employer, Miller must meet them head on and rebut them by either "persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation was unworthy of credence." *Raspanti*, 266 F. App'x at 823-24 (citations and internal quotations omitted).  Importantly, an employer is permitted to terminate an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Abel v. Dubberly*, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000). It is well established

> courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how high-handed its decision process, no matter how mistaken the firm's managers, the [FLSA] does not interfere. Rather, [the Court's] inquiry is limited to whether the employer gave an honest explanation for its behavior.

*Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  It is therefore irrelevant whether Miller can establish that she did not actually post negative comments on Facebook and that she did not actually intend to resign because as long as the Defendants' "believed" Miller did, and this belief was the reason the Defendants made Miller's resignation effective immediately, then there is no retaliation. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (stating for purposes of analyzing whether the employer's reason for

terminating the appellee for allegedly harassing fellow employees was pretextual, the court could assume the complaining employees were "lying through their teeth" because the relevant inquiry was whether the employer "believed" the appellee harassed other employees, "and if so, whether this belief was the reason behind [the appellee's] discharge").

Miller has presented no evidence that the Defendants' proffered reasons were pretext for retaliation. Miller's husband had been pushing her to resign and soliciting alternative employment positions for over a week. Prior to the Defendants ever knowing about Miller's needs with respect to pumping, they received a phone call from Meyer informing them that Miller had been posting negative comments regarding the Defendants on Facebook. The Facebook comments were not about any pumping needs and the Defendants were unaware of anything that would have prompted Miller to post the Facebook comments. It was at that time the Defendants decided to monitor Miller's work email.

Although Miller alleges she had no interest in leaving, the email correspondences between Miller and Spiro show she had sent him her resume, agreed to have an attorney review her employment agreement, and told him "Cool . . . so over this" when informed he was soliciting jobs for her. On the morning of September 7th, Spiro sent Miller a draft resignation letter dated that day and Miller told a friend "Today could be the day!" she resigned. It was only after all this that Miller sent her first and only request for a time and place to pump at work. Roche, who was not Miller's supervisor, forwarded it to Diliberto and Martin, both of whom agreed it would not be an issue.

Before having a chance to talk about her request, Miller was approached by Diliberto and Martin regarding her resignation letter, the emails, and Facebook comments. Miller told

them she was not happy and signed her resignation letter, which was made effective immediately. Miller does not alleged any comments, actions, or inactions by the Defendants that would show the Defendants' refused to provide her a place and time to pump in the past and that they retaliated against her for making the request rather than complying with it. Accordingly, as long as the Defendants believed Miller made comments on Facebook and intended to resign, and this was the reason behind making her resignation effective immediately, there is no retaliation and the Defendants are entitled to summary judgment in its favor. *See Elrod*, 939 F.2d at 1470.

> **B.     Miller cannot Establish she was Denied a Reasonable Break Time and Appropriate Place to Express Breast Milk at Work**

Miller has failed to establish the Defendants violated the FLSA by denying her a reasonable break time and appropriate place to express breast milk at work. *See* 29 U.S.C. § 207(r)(1).  Miller's rights to time and place for expressing milk are given by an amendment to the FLSA.  The sparseness of that legislative pronouncement, and its placement in the FLSA, a law that does not otherwise treat the allocation of an employer's facilities or the specific activities for which a break must be given, make interpretation of the law difficult. The fact that the DOL, charged with enforcement of the new law, declined to promulgate rules, for the expressed reason that they would not be helpful, strongly suggests that there is much that must be determined ad hoc about the law.

Consistent with that reality, the DOL suggests that employees "give employers advance notice of their intent to take breaks at work to express milk" and to "discuss with their employers what they expect they will need." Reasonable Break Time for Nursing Mothers, Vol 75, No. 244 Fed. Reg. 80075, 80077 (Dec. 21, 2010). This is because the

frequency and timing of a nursing mother's breaks vary based on a number of individual factors and the nursing mother and employer should develop a "shared expectation and an understanding of what will constitute 'a reasonable break time' and how to incorporate the breaks into the work period." *Id*. at 80073, 80075, 80077.  The employer is not required to create a permanent space for a nursing mother, but where practical either make a room available or create a space with partitions or curtains. *Id*. at 80075-76. In order to be considered a functional space, the "space must contain a place for the nursing mother to sit, and a flat surface, other than the floor, on which to place the pump."[23] *Id*. at 80076. The employer should ensure the nursing mother has privacy by covering windows and through the use of signs that designate the space is in use or a lock on the door. *Id*. at 80075-76.

Miller does not suggest that her office, with the sidelight covered, would not afford the privacy required for expressing her milk.  Indeed, she engaged in that activity twice a day for every work day on which she was at work until her resignation was accepted, with no impediment except the two instances on which she alleges co-workers walked in on her.  All agree that Miller's office had a door lock.  She tested that lock and it worked, except for the two times when the co-workers walked into her office while she was pumping.  She did not inform anyone of the supposedly non-functioning lock, nor did she place a "do-not-disturb" sign on her exterior door. Thus Miller cannot show that she was denied a private place within which to express milk.

When she was working at Roche Bail as her own private bail bond company, she was

---

[23] The DOL requested comments regarding whether spaces "such as manager's officers, storage spaces, utility closets, and other such spaces normally used for other purposes could be considered adequate spaces for use by nursing mothers." *Id*. at 80076.

not an employee of Roche Surety and she does not allege an entitlement to a place for expressing milk during that time. (Miller at 70-71). On the one occasion on which she worked at Roche Bail as an employee of Roche Surety covering that office, she did not need to express milk because the shift was only two hours long. (Miller at 49-50). Even if she had, she had more than enough space to do so.  Roche Bail is located in a double-wide trailer used as its offices. There is and was at least one room which was not monitored.  Miller knew this to be the case because the cameras' images were displayed inside the office and she had access to that monitor. Miller says the office was cluttered. Clutter is not mentioned by the DOL as an issue with compliance. Miller also could have used her office at Roche Surety by calling over and having a co-worker at Roche Surety cover the Roche Bail building for her.

The only time Miller alleges Roche Surety refused to provide her a break time was on September 8th, when Miller was scheduled to work at the Roche Bail building. (Miller at 87). Miller would have been as an employee of Roche Surety and would have received her hour break for lunch and two fifteen minute discretionary breaks. Miller was also permitted to take additional breaks, and the breaks provided Miller more than enough time to pump because she claims she only had to pump two times during the day for ten minutes each time. Indeed, she apparently had ample time at work to express milk because she does not claim to have ever been denied that time or docked in pay for taking it.

## IV.   CONCLUSION

The Defendants are entitled to summary judgment in its favor because Miller has failed to establish she was: (1) retaliated against for engaging in protected activity; and (2) denied a reasonable break time and an appropriate place to express breast milk at work.

Respectfully submitted this 27th day of September, 2011.

/s/ Thomas M. Gonzalez
Thomas M. Gonzalez
Florida Bar No.: 192341
Nathan J. Paulich
Florida Bar No.: 0085190
Thompson, Sizemore, Gonzalez & Hearing, P.A.
One Tampa City Center
201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
tgonzalez@tsghlaw.com
npaulich@tsghlaw.com
Attorneys for the Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished on this 27th day of September, 2011, by CM/ECF electronic filing to the Clerk of Court and to the following:

Luis A. Cabassa
Wenzel Fenton Cabassa, P.A.
1110 N. Florida Avenue, Suite 300
Tampa, FL  33602

/s/ Thomas M. Gonzalez
Attorney