# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**DANIELLE MILLER,**

   **Plaintiff,**

**vs.**                                                         **Case No.: 8:10-cv-2475-RAL-TBM**

**ROCHE SURETY AND CASUALTY CO.,
INC., ROCHE BAIL BONDS, INC. and
SHANNON ROCHE,**

   **Defendants.**

_____/

## <u>DEFENDANTS' TRIAL BRIEF</u>

In accordance with the Court's Case Management and Scheduling Order, (Dkt. 9), and its Orders dated October 28, 2011, (Dkt. 43), and November 3, 2011, (Dkt. 46), the Defendants, Roche Surety and Casualty Co., Inc. ("Roche Surety"), Roche Bail Bonds, Inc. ("Roche Bail") and Shannon Roche ("Roche"), (collectively the "Defendants"), file their trial brief on issues of law that the Defendants' believe will likely arise in the course of the trial. Before the Court is whether the Defendants violated 29 U.S.C. § 215(a)(3) by retaliating against the Plaintiff, Danielle Miller ("Miller"), and whether the Defendants violated 29 U.S.C. § 207(r)(1) by failing to provide Miller reasonable break times to express breast milk and suitable place in which to perform that act. The Defendants assert that the evidence presented at trial will demonstrate that the Plaintiff cannot prevail as a matter of law on both her claims.

**TABLE OF CONTENTS**

I.      Procedural Background……………………………………………………..3

II.     Factual Background………………………………………………………...5

III.    Evidentiary Issues………………………………………………………11

        A.      Defendants' Exhibit 37………………………………………………11

        B.      Defendants' Exhibit 7………………………………………………...15

        C.      Defense of Failure to Mitigate………………………………………15

IV.     Legal Issues Related to 29 U.S.C. § 207(r)(1)………………………………16

        A.      Coverage under the FLSA if no Employer-Employee Relationship...16

        B.      Employer's Obligation to Act and Notice Required…………………18

        C.      Appropriate Place to Express Breast Milk…………………………...19

                1.      Choice of Places or Designation of Places…………………..20

                2.      Employer's Obligation to Provide Window Treatment, Lock or Signs…………………………………………………………21

                3.      Roche Bail Trailer…………………………………………23

                        i.      Non-traditional Work Space…………………………23

                        ii.     Location of Appropriate Place………………….....24

        D.      Reasonable Break Time…………………………………………...25

V.      Legal Argument……………………………………………………………...27

        A.      Miller was not retaliated against for engaging in protected activity…27

                1.      Miller did not engage in activity protected by the FLSA……28

                2.      Miller did not suffer an adverse employment action after asserting rights protected under the FLSA…………………..31

        3.      Miller cannot show her alleged assertion of rights was the "but for" cause of the alleged adverse action……………………..32

        4.      Miller cannot Rebut the Defendants' Legitimate Non-Retaliatory Reason for Making her Resignation Effective Immediately…………………………………………………33

    B.     Miller cannot Establish she was Denied a Reasonable Break Time and Appropriate Place to Express Breast Milk at Work…………………34

VI.    Conclusion……………………………………………………………………...36

## I.    PROCEDURAL BACKGROUND

Section 207(r)(1) of the FLSA was enacted as a largely unpublicized and little noted part of the Affordable Health Care Act ("AHCA").  It took effect on March 23, 2010.  The relevant portion of the AHCA added the following to the FLSA's provisions governing overtime:

207(r)(1)  An employer shall provide—

(A) a reasonable break time for an employee to express breast milk for her nursing child for 1 year after the child's birth each time such employee has need to express the milk; and

(B) a place, other than a bathroom, that is shielded from view and free from intrusion from coworkers and the public, which may be used by an employee to express breast milk.

The quoted provision has no logical or statutory connection to the section of the FLSA in which it was placed.  Section 207 is entitled "overtime hours."  It consists on several provisions, all of which deal with a requirement to compensate employees for hours worked in excess forty in a workweek or the methods by which that obligation may be satisfied.  Subsection (r)(1) is the only part of the law that imposes a requirement for breaks or an obligation to provide a certain kind of environment in which to take that break.  Indeed,

the FLSA does not in any other part require that employees provide any break whatsoever, an employees may be worked twenty-four hours a day, every day of the week, so long as time and one-half is paid for all hours in excess of forty.

Section 207(r)(1) does not define what constitutes a reasonable break time or "a place." Nor does it treat in any way the process by which an employer would become aware of the employee's need for a time or place.

On June 17, 2010, Miller gave birth to a child.  Following her pregnancy, she was afforded approximately eleven weeks of paid time off, even though the Defendants had no legal obligation whatsoever to do so. In July of 2010, the United States Department of Labor ("DOL"), the agency responsible for enforcing the law, published its Fact Sheet #73: Break Time for Nursing Mothers under the FLSA (hereinafter "Fact Sheet"), which provided general information on the break time requirement for nursing mothers to assist employers with complying with the new law. The Fact Sheet, however, did not provide much guidance or clarity.  It stated the frequency and duration of the breaks needed would likely vary from mother to mother and that the location, whether dedicated for nursing mothers or temporarily created or converted into a space, "must be functional as a space for expressing breast milk," which it did not describe, and made available "when needed" by a nursing mother. The DOL promised it would provide "additional guidance" on the break time requirement "in the near future."

On August 23, 2010, Miller returned to work from maternity leave and just over two weeks later, on September 7th, resigned. Miller filed her two-count complaint on November 5, 2010, (Dkt. 1), and an amended complaint on November 15, 2010. (Dkt. 6).  In count I of

the amended pleading, Miller alleges that she engaged in "protected activity" under the FLSA, which she does not describe, and was retaliated against when she was terminated or constructively discharged from her employment. (*Id*. at ¶¶ 22-25). In count II, Miller alleges that the Defendants failed to provide her with a reasonable break time and/or statutorily required location to express breast milk at work. (*Id*. at ¶¶ 26-29).

On December 21, 2010, the DOL published a request for public information regarding the new law, establishing a deadline of February 22, 2011, for receipt of comments. Reasonable Break Time for Nursing Mothers, Vol. 75, No. 244 Fed. Reg. 80073-74 (Dec. 21, 2010) (hereinafter "Nursing Mothers"). After receiving the comments, the DOL specifically declined to promulgate regulations to interpret the law because regulations would not be "the most useful or effective means for providing initial guidance to employers and employees." *Id*. at 80073. In December of 2010, the DOL also published a revised Fact Sheet, which was largely duplicative of the original Fact Sheet.

## II.    FACTUAL BACKGROUND

At the times relevant to this suit, Miller was employed by Roche Surety and worked Monday through Friday from 8:30 a.m. until 5:30 p.m.[1] Miller was expressly allowed an hour-long break for lunch and two fifteen minute breaks, which she could take at times of her own choosing, but she was in fact permitted to take additional breaks without receiving prior permission from a supervisor. Breaks were never timed and Miller was never criticized or disciplined for taking too many, or too long, breaks. Miller was assigned her own office,

---

[1] For purposes of the trial brief, the Defendants have provided an abbreviated version of the facts relevant to the issues of law to be determined. For a full recitation of the facts, please see the Defendants' Motion for Summary Judgment. (Dkt. 19).

which had a door that had a push-in interior lock. The office had an exterior window, with blinds, and an interior sidelight adjacent to the office door, which had no blinds or other treatment.

Although employed by Roche Surety, Miller occasionally worked at the Roche Bail trailer during her regularly scheduled hours at Roche Surety and during these times was considered and treated as an employee of Roche Surety. The Roche Surety and Roche Bail buildings were approximately a minute and a half walk from each other and Miller was permitted to leave the trailer during her breaks, without asking a supervisor, as long as there was coverage, which she could obtain on request.

Miller also worked at Roche Bail on Wednesday nights, from 5:00 p.m. to 10:00 p.m. executing bail bonds as Danielle Miller Bail Bonds ("DMBB"), her sole proprietorship, and paying Roche Bail a percentage of her sales. Miller was not an employee of Roche Surety or any other entity except DMBB. In fact, Miller was like any other licensed bail bond agent using Roche Surety as her insurer and she would pay Roche Surety a premium for insurance written on bail bonds.  During her shifts as DMBB, Miller was often the only person on site at the trailer and had complete control over her own time and efforts. Miller could lock the trailer and leave if she desired. The trailer had at least two offices and a file room which were not video monitored for safety purposes and available to Miller to use without request.

Before she returned to work after the birth of her child, Miller visited the workplace to show off the baby and during that visit allegedly spoke to Shannon Roche, co-owner and president of Roche Surety, and told her that she (Miller) planned to breastfeed her child until

he was one year old. Miller did not tell Roche she would need to pump at work nor did she make any request for a place or additional break times to pump.

Miller returned to work on August 23rd and openly expressed her desire to be a stay-at-home mom. On her first day back, Miller, without informing anyone she planned on pumping or of any needs she may have with respect to that practice, placed manila folders over her office sidelight. The folders covered the majority of the window and Miller admits they afforded her privacy. The folders remained up for the rest of time she worked at Roche Surety, without complaint or adverse consequences.

Miller alleges that after she was finished covering her window, Melissa Martin, her supervisor at Roche Surety, asked her why there were manila folders on her window. Miller alleges she told Martin she covered the window because she needed privacy in order to pump. Miller, however, did not make a request for a break time or appropriate place to express breast milk at work, nor did she explain any expressing needs she may have.

Miller decided to use her office to pump without incident except for two alleged occurrences. She pumped two times during the work day, taking approximately ten minutes each time for the process. Miller used her lunch break to visit her child, who attended a day care facility close to his mother's work, and overstayed her lunch on numerous occasions which caused other employees in her department to miss or delay their lunch to cover for her.

Miller alleges that on two occasions coworkers walked in to her office while she was pumping.  On both occasions Miller alleges her door was closed and locked, but that the coworkers, without knocking, were able to walk in on her. Miller never mentioned the incidents to anyone at Roche Surety nor did she make a service request for a new lock, even

though Roche employed a full-time maintenance man.  Miller continued to pump in her office without informing Roche Surety and did not place a sign on her door to prevent other people from disturbing her or take any other action.

Miller also alleges that on August 25, and September 1, she (as DMBB) worked as a bail bond agent at Roche Bail, locked the door to the trailer and pumped in the restroom, even though there were multiple appropriate places for her to pump in the trailer or at the Roche Surety building. Miller did not inform anyone at Roche Bail that she had planned to, or indeed did, pump and admits she was "fine" with pumping in the bathroom because she was working as DMBB and there was no one else there during her shift.

On or about August 31, 2010, Miller made a comment on Facebook that she was "[r]eally starting to hate the situation" she was in at work. Miller stated there was "[t]oo much drama to voice on [Facebook] but enough to write a book" and asked a coworker to "describe this BS?" Miller had been making Facebook posts for about a week about how things were not going well at Roche Surety. The Facebook posts, which were unrelated to expressing at work, prompted Toni Meyer, a bail bond agent of in Idaho whose business was insured by Roche Surety, to call Roche Surety because she was worried something serious was going on that may adversely affect her business. Roche was unaware of Miller's Facebook posts or anything that would have caused Miller to post negative comments and decided at this time to monitor Miller's work email. Roche became aware of several pieces of correspondence regarding Miller's search for alternative employment and her intent to resign.

At 8:51 a.m. on September 7th, Miller's husband sent her a resignation letter addressed to Roche and dated that day. At this time Miller had never made a request for a

place or additional break times to pump, nor had she ever been denied a place and time to pump. The resignation letter made no mention of expressing milk or any work-related problems Miller was having in that regard.

That morning or early afternoon, a meeting was held between Roche and Eddie Diliberto, the controller and the employee responsible for human resources, because Miller's resignation letter had been found and Roche wanted Diliberto to find out whether Miller was contemplating resigning. Diliberto agreed to speak with Miller that day to find out if she wanted to resign. Roche did not give Diliberto an instruction to terminate Miller nor was there a back up plan in case Miller did not resign.

At 1:12 p.m., Roxanne Barton, Miller's friend, asked whether Miller had made it in to work because of a Facebook comment she posted the night before. Miller said she made it in but was "looking into alternatives" and that "Today could be the day!" In fact, Miller showed Rosa Meehan, her co-worker, the resignation letter and told her she would probably turn it in.

Miller was scheduled to work the following day at the Roche Bail trailer as an employee of Roche Surety and, at 1:20 p.m., emailed Roche informing her that she would need to pump at least two times during the day and requested a place other than a bathroom to pump. This was the first contact between Miller and Roche Surety regarding any needs she had with respect to expressing breast milk at work and Miller was hoping someone could watch the Roche Bail trailer while she used her office at Roche Surety. The email did not contain any expression of a feeling that Roche Surety had denied her a place and time to pump in the past, nor did it say anything about allegedly not being treated well with respect to pumping. In fact, the email made no mention of the FLSA.

From approximately 2:30 p.m. to 4:00 p.m. that day Miller was assigned to provide phone coverage at the Roche Surety reception area, covering for another employee. Miller did not request a break time to express breast milk during her phone coverage, and could have taken a break at her own discretion. Roche, who was sick and had left work for the day, did not make or oversee Miller's schedule and forwarded her email request to Diliberto and Martin at 3:23 p.m. Diliberto and Martin responded back to Roche that it would not be an issue to provide the requested breaks and place for Miller to pump.

Miller saw Roche leave the office during her phone coverage but at approximately 3:30 p.m., asked Diliberto whether he had seen Roche because she had not received a response to her email request. Diliberto informed Miller that Roche had left and that she should forward him the email, which they could discuss after her phone coverage.

Within the hour, Diliberto and Martin came to Miller's office and asked her whether she wanted to resign. Diliberto asked Miller whether she was happy because her resignation letter had been found and the Defendants were aware that she made some comments on Facebook. Miller told Diliberto and Martin she was not happy under the circumstances and signed her resignation letter. The resignation was made effective immediately, which was standard practice for the Defendants, and Miller signed a letter acknowledging her employment had been terminated and agreeing that she would cease posting information on Facebook about the Defendants and its agents.

### III.   EVIDENTIARY ISSUES

### A.   Defendants' Exhibit 37

The Plaintiff has objected to the Defendants Exhibit 37 on the basis that the document was not produced to the Plaintiff until October 27, 2011, the date the joint pretrial statement was filed, that it is not relevant under Federal Rules of Evidence 402 and 403, that the document contains hearsay and is not authentic. (Dkt. 42 at 9). The Defendants Exhibit 37 is a Facebook post made by Miller on or about August 31, 2010, in which Miller posted "Really starting to hate the situation I'm in." A coworker, Rochanda Monroe, commented on Miller's post that "Humph hate is not a strong enough word." Kyle Clements, a person with no affiliation to the Defendants, commented "Work? Whats wrong?" In response, Miller commented "Yup work. Too much drama to voice on f[ace]b[ook] but enough to write a book. Rochanda which word would u use to describe this BS?"

The Defendants Exhibit 37 is clearly relevant to the allegations of the lawsuit. The Court identified whether Miller made negative comments about the Defendants on Facebook as an issue of material fact, (Dkt. 38 at 2), and Miller's comments go towards her state of mind at the time and her resignation, which the Defendants contend were unrelated to expressing breast milk at work. Moreover, the Facebook post prompted Meyer to call Roche Surety because she was concerned there was something going on at Roche Surety that may adversely affect her business because Miller stated there was a "bunch of bullshit going on" at work. (Dkt. 26 at 17-18, 21). It was at this time that the Defendants began to monitor Miller's work emails and discovered Miller was searching for alternative employment and planned to resign.

Courts consider three factors when deciding whether to exclude previously undisclosed evidence: (1) the importance of the evidence; (2) the reason for the party's failure to disclose the evidence earlier; and (3) the prejudice to the opposing party if the evidence is considered. *See Bearint ex. rel. Bearint v. Dorell Juvenile Group, Inc.*, 389 F.3d 1339, 1353 (11th Cir. 2004) (reviewing district court's exclusion of a witness not listed on the pretrial order); *see also Munnings v. Fedex Ground Package Systems, Inc.*, 2008 WL 1849003, *6 (M.D. Fla. 2008) (applying *Bearint* for motion to strike previously undisclosed evidence under Rule 37). Miller cannot argue that she has been prejudiced by the fact the Facebook comment was not produced until October 27, 2011, because Miller is the one who actually made the post and would have been able to access it from her own Facebook account at any time during the lawsuit.  In her deposition, Miller was asked on numerous occasions whether she made any Facebook posts, with or without the use of the Defendants' name, that were or could have been perceived as antagonistic, adverse, or derogatory towards, or which indicated that she was angry with the Defendants in 2010. (Dkt. 22 at 59-62, 86).  Miller denied ever making such a post. (Dkt. 22 at 59-62, 86). Miller testified that she did not recall ever deleting any comments or posts made on Facebook, and that if anything was posted by her it would still be available to her. (Dkt. 22 at 59). Miller did admit to deleting friends from Facebook, (Dkt. 22 at 59), which limits who would have access to Facebook posts made by Miller. Despite the deposition questions, Miller never supplemented any requests to produce to include her Facebook posts. On August 1, 2011, the Defendants served its second request for production which made four separate requests for Facebook comments posted by Miller. Miller answered that no such Facebook comments or posts existed and her counsel informed

the Defendants that Miller allegedly could only access her Facebook account back to December of 2010 and therefore could not find any responsive documents.

The Defendants acted in good faith in producing the Facebook post because it was not until the afternoon of October 27, 2011, that counsel for the Defendants received a copy of the Facebook post from Meyer. Meyer, who is not a party to this suit and is not an employee of the Defendants, called the Defendants' counsel that day because she found the post while shredding business papers accumulated over the past year. It was provided to counsel for Miller that afternoon and added as an exhibit for the Defendants in the joint pretrial statement.[2] (Dkt. 42-2). Meyer's discovery of the Facebook post is consistent with her deposition testimony in which she testified that she did not have a copy at the time the deposition was taken because she had thrown it away approximately a week before Roche called her to inform her the Defendants had been sued and to inquire whether she still had the post.[3] (Dkt. 26 at 12, 19-20). Meyer was unable to access Miller's post on Facebook, like she did at the time it was printed, because Miller de-friended Meyer shortly after she called the Defendants in late August or early September of 2010. (Dkt. 26 at 15, 21).

In the Plaintiff's Trial Brief, she argues she would be prejudiced by the introduction of the Facebook post because she was unable to conduct any discovery related to this document, including questioning Meyer and Roche. (Dkt. 62 at 10-11). Miller was well aware the Defendants believed Miller had made negative postings on Facebook about the

---

[2] The Pretrial Order specifically provides for circumstances where new evidence is discovered *after* the Pretrial Order.  (Dkt. 44) (emphasis added). The party wishing to introduce the evidence shall immediately notify the opposing counsel and the court and the evidence may be introduced by order of the court and in furtherance of justice.  (Dkt. 44).  Miller would not be prejudiced by the introduction of Exhibit 37 because it was discovered and provided *before* the Pretrial Order and it was included as an exhibit in the Joint Pretrial Statement, which merges all previously filed pleadings.

[3] The Defendants also did not have a copy of the Facebook post at the time Miller filed her lawsuit.

Defendants and had ample opportunity to conduct discovery regarding any knowledge with respect to these postings. In fact, Miller's counsel took depositions of Meyer and Shannon Roche and asked numerous questions regarding Facebook and posts made by Miller. (Dkt. 24 at 32-39, 45, 73-74), (Dkt. 26 at 7-25). Accordingly, Miller will not be prejudiced by the introduction of the Facebook post into evidence.

Miller argues that the exhibit should not be permitted because of authenticity but the post is consistent with Meyer's deposition testimony and Meyer will be able to testify that the exhibit is authentic and prompted her to call the Defendants. Fed. R. Evid. 901(a) & (b)(1). Additionally, Miller and Rochanda Monroe will be able to testify towards the exhibits authenticity because the Facebook post contains comments from both individuals. Counsel for Miller argues the Facebook post contains no date, but Meyer was able to determine the approximate date it was posted by referencing a photo album Meyer created regarding "ponderay lake" on August 31, 2010. The photo album appears immediately above Miller's post on Meyer's newsfeed for the day it was printed. The Facebook post states it was posted 23 hours ago because Meyer printed it from her newsfeed the day Miller posted it.

Finally, Miller argues the Facebook post should be excluded because it is hearsay. The exhibit is not hearsay because it is not being offered to prove the truth of the matter asserted. The post contains comments made by Miller herself which she will be able to testify about. Moreover, Meyer would be able to testify that the exhibit is one of the Facebook posts that prompted her to call the Defendants, and Rochanda Monroe will be able to testify about the comments she made.

**B.      Defendants' Exhibit 7**

Miller alleges that Defendants' Exhibit 7, an email exchange between Miller and Jeannette Winkelmann on August 26, 2010, should not be permitted into evidence because it is not probative to any of the issues that remain in this case.  The email exchange occurred during Miller's first week back from maternity leave and, in response to Winkelmann asking Miller whether she was okay, Miller states "Yeah im fine just sick of working already."  The email is relevant to Miller's subjective and objective belief at the time she allegedly made a complaint to the Defendants and is also relevant to showing Miller resigned for reasons unrelated to expressing breast milk at work.

**C.      Defense of Failure to Mitigate**

Miller cannot argue she is prejudiced by the Defendants raising the defense of failure to mitigate because Miller was asked specific questions in her deposition regarding mitigation including any employment she has had since resigning, any search for new employment opportunities, and any money received from unemployment compensation. (Dkt. 22 at 4-6, 87).   Additionally, in the Defendants' First Set of Interrogatories to the Plaintiff, Miller was specifically asked to describe any efforts to obtain employment between the time she resigned with the Defendants to the present. (Dkt. 19-2 at ¶ 13). Miller testified that since September 7, 2010, she has worked part-time, between twenty and twenty-seven hours a week, as a work-at-home sales representative at the Home Shopping Network. (Dkt. 22 at 6), (Dkt. 19-2 at ¶ 13). Miller last looked for work in December of 2010. (Dkt. 22 at 6).

## IV.     LEGAL ISSUES RELATING TO 29 U.S.C. § 207(R)(1)

As of this date, the DOL has not published the content of any comments which were in fact received nor has it promulgated any regulations interpreting § 207(r)(1). Additionally, there are currently no court opinions which provide guidance for the law. In fact, as of the date of all material facts of this case no such guidance was available except for the statute itself and the original Fact Sheet. Many issues of law are unresolved, and the Defendants believe that some treatment of potential issues should be provided before trial.  Otherwise, the parties will have no alternative but to press their respective interpretations through examination and objections.  In that case, each ruling the Court makes will in fact become the law to be applied in the jurors' minds.

### A.     Coverage under the FLSA if no Employer-Employee Relationship

The relevant portion of the AHCA amended the FLSA's overtime provision and therefore it does not apply in the absence of an employer-employee relationship. 29 U.S.C. § 207. Indeed, both the DOL Fact Sheet and request for comments state that a nursing mother is only entitled to breaks to express breast milk is she is not exempt from section 7 of the FLSA. Nursing Mothers at 80074. To determine whether Miller was an employee of each individual Defendant, the court must determine whether "as a matter of economic reality, an individual is an employee or an independent contractor in business for himself." *Freund v. Hi-Tech Satellite, Inc.*, 185 F. App'x 782, 782-83 (11th Cir. 2006) (citations omitted). Courts look at several factors, including:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;

16

(3) the alleged employee's investment in equipment or materials required for
his task, or his employment of workers;
(4) whether the services rendered requires a special skill;
(5) the degree of permanency and the duration of the working relationship;
(6) the extent to which the service rendered is an integral part of the alleged
employer's business.

*Id*. at 783.

Miller worked a Wednesday night shift at the Roche Bail trailer as DMBB, her own sole proprietorship. Miller was not an employee of the Defendants during this time and received no compensation from the Defendants. Instead, Miller had complete control over her own time and efforts, including whether she would work or decide to execute a bail bond for a customer. Miller was like any other licensed bail bond agent in business for herself and would pay Roche Bail a percentage of her sales and Roche Surety premium for the insurance on the bail bonds executed.

Miller alleges that on two occasions while working as DMBB she expressed breast milk in the restroom and had to throw away the milk. Miller admits she was fine with using the restroom because she was working as her sole proprietorship and there were no other people present during her shifts. Because Miller was not an employee of Roche Bail or Roche Surety while working as DMBB, she was not covered by the FLSA and had no entitlement to a reasonable break time or appropriate place. Accordingly, any evidence of the Defendants alleged failure to comply with § 207(r)(1) for expressing in the restroom of Roche Bail would not be relevant to her claims of substantive violations or for her subjective and objective belief that the Defendants were engaged in unlawful employment practices at the time she allegedly made a complaint.

###### B.      Employer's Obligation to Act and Notice Required

Section 207(r)(1) states an employer must provide a nursing mother reasonable break times and an appropriate place to express breast milk each time the mother has a need, but is silent on whether the nursing mother must provide the employer advance notice and, if so, the substance of the notice which would trigger an employer's obligation to act and to whom it must be provided. Similarly, the Fact Sheet in effect at the time of Miller's employment provided no guidance for the timing and substance of any notice.

The DOL encourages nursing mothers to provide employers with advance notice of their intent to take breaks at work to express breast milk prior to returning to work so that the employer can help facilitate arrangements to comply with the law. Nursing Mothers at 80077. Recognizing the inherent differences in nursing schedules for mothers, nursing mothers should discuss the expected frequency and timing of breaks,[4] and employers discuss the location and availability of places. *Id*. at 80075. This would help develop a shared expectation and understanding as to what constitutes a "reasonable break time" and how they will incorporate the break into the nursing mother's workday. *Id*. The DOL solicited comments on how to address notice issues consistent with the language of the law which requires break time and space for each time the nursing mother has a need. *Id*. at 80077.

Miller alleges while on maternity leave she talked with Roche about her plans to breastfeed her child, but she did not make a request for particular break times or an appropriate place to express when she returned to work. Miller also alleges that on her first

---

[4] The DOL stated the frequency of breaks needed to express breast milk will vary based on a number of factors such as "the age of the baby, the number of breast feedings in the baby's normal daily schedule, whether the baby is eating solid food, and other factors." Nursing Mothers at 80075.

day back at work she asked Martin to buy window treatment for her office window because she needed privacy to express. Miller does not allege that she informed the Defendants of the frequency and timing of the breaks she would need to express breast milk until September 7th, which was after she was allegedly walked in on by coworkers and used the restroom at Roche Bail. Moreover, Miller does not allege that she had a discussion about the potential places available at the Defendants' offices she could use.

If the Defendants did not have an affirmative duty to anticipate Miller's expressing needs based on knowledge of her pregnancy or alleged knowledge that she would be breastfeeding, or if Miller's alleged request for window treatment was insufficient to provide the Defendants advance notice of her intent to express breast milk at work, then any evidence of the alleged failure to provide a reasonable break time or appropriate place to express breast milk prior to her September 7th, email request would be irrelevant. Similarly, if Miller had to make a request for a break and place each time she had a need then evidence of the alleged failure to comply with the law would be irrelevant unless Miller made such a request each time she pumped. Even assuming Miller put Roche Surety on notice, Miller does not allege ever informing Roche Bail of any needs and therefore any evidence of her alleged pumping in the Roche Bail restroom during her shifts as DMBB would be irrelevant.

### C.      Appropriate Place to Express Breast Milk

Section 207(r)(1) requires an employer provide a place, other than a bathroom, that is shielded from view and free from intrusion which may be used by a nursing mother to express each time she has a need.  The law does not define a "place" or a "bathroom" nor

does it provide guidance on what an employer must do to make a place shielded from view and free from intrusion.

### 1.      Choice of Places or Designation of Places

Nothing in § 207(r)(1) requires an employer provide the nursing mother a choice amongst appropriate places or designate a specific place for the nursing mother to use to express. The DOL Fact Sheet states a place must be functional for expressing breast milk, but does not require an employer provide a dedicated place for nursing mothers. Rather, it states an employer will be in compliance if a space is temporarily created or converted into a space for expressing milk and made available when needed as long as the space is shielded from view and free from intrusion.  Similarly, in its request for comments, the DOL interpreted § 207(r)(1) to require an employer to, where practical, make a room available to the nursing mother or otherwise create a "private space" with the use of partitions or curtains. Nursing Mothers at 80075-76.  The DOL opines that a place would be considered functional to express breast milk if the space contained "a place for the nursing mother to sit, and a flat surface, other than the floor, on which to place the pump." *Id*. at 80076.

Miller decided to use her own office to pump even though she never asked whether the Defendants had a place for her to use each time she had a need. Miller alleges her office was not shielded from view and free from intrusion because she had to cover a window with manila folders and was allegedly walked in on by coworkers while expressing. She also alleges there was no appropriate place at the Roche Bail trailer because each room was allegedly video monitored except for the restroom.

If the law does not require an employer provide an employee a choice amongst appropriate places or to designate a specific place for use, then the Defendants would be in compliance with the law as long as one appropriate place was available for Miller to use, each time she had a need. The Defendants would have had no obligation to allow Miller to use her office and Miller would have the burden of showing there were no appropriate places available for her to use, not just that the places she decided to use were allegedly inappropriate. Accordingly if one appropriate place was available, it would be irrelevant whether Miller preferred to use another place or actually chose to use another place which may or may not have been an appropriate.

### 2.      Employer's Obligation to Provide Window Treatment, Lock or Signs

Section 207(r)(1) provides that the place used to express breast milk must be free from intrusion from coworkers and the public, but does not provide any guidance on what an employer's obligations are, if any, to ensure such privacy.  Similarly, the Fact Sheet does not state whether an employer would be required to provide window treatment, a lock or signs to ensure a place is free from intrusion. In its request for comments, the DOL opines an employer would not be required to provide a nursing mother a room and could be in compliance with the law if a space was created with partitions or curtains. Nursing Mothers at 80075. If an employer does designate a place for use, the DOL opines that "[a]ny windows in the designated room or space should be covered to ensure the space is 'shielded from view.'" *Id*. at 80075-76. The DOL does not provide examples of how the window must be covered. The DOL also states an employer must ensure privacy in any place provided through means such as signs for when the space is in use or a lock on the door. *Id*. at 80076.

The DOL did not provide examples of other means which may be used to ensure privacy, nor did it comment on whether an employer could force a nursing mother to use such means.

Miller decided to use her office at Roche Surety to pump. Before informing the Defendants of any pumping needs Miller placed manila folders over her window which she admits provided her privacy because it blocked the view inside her office. Miller had a lock on the door but alleges it did not function properly resulting in coworkers walking in on her twice while expressing. Miller did not inform the Defendants of her nonfunctioning lock, nor did she request signs, because she did not feel they were necessary.

The Defendants would have had no obligation to purchase window treatment because it could have required Miller to use another place to pump or covered the window in her office through other means. After Miller placed the manila folders over her window, the Defendants should have had no obligation to provide additional cover for the window because the folders shielded the office from view.  As a matter of law, Miller's office would have then been an appropriate place for her to use to pump.

If the Defendants had no obligation under the law to provide Miller a lock or force her to use signs, then two coworkers allegedly walking in on her because of a nonfunctioning lock would be irrelevant. Similarly, if the Defendants' obligation to provide means such as a lock or signs required Miller to request them or for the Defendants to have knowledge of the breaks Miller planned to take to express, then without such request or knowledge the Defendants would have been in compliance with the law even if the lock or signs were not provided. Finally, if the Defendants could not force Miller to use signs, and she decided it

was not necessary for her privacy, then the Defendants would not have had to provide additional measures for privacy.

### 3.      Roche Bail Trailer

The Court found a genuine issue of material fact existed whether the Plaintiff had access to a private room in the double-wide trailer housing the Roche Bail office because the Plaintiff alleged the only room available to her was a bathroom. (Dkt. 38 at 2).

### i.      Non-traditional Work Space

Section 207(r)(1) left undefined what constitutes a place under the law and did not provide any guidance for places to use in nontraditional workplaces such as a trailer. The DOL acknowledged that a number of work settings are not in office buildings and that employers face a unique challenge in providing nursing mothers an appropriate space. Nursing Mothers at 80076. The DOL requested comments that address whether "spaces such as manager's offices, storage spaces, utility closets, and other such spaces normally used for other purposes could be considered adequate spaces for use by nursing mothers under the statute." *Id.*  In fact, all the DOL requires for the space to be considered functional to express breast milk would be for the nursing mother to have a place to sit on and a flat surface, other than the floor, on which to place her pump. *Id.* at 80076. The DOL also requested comments for "creative solutions" to provide break time and space for nursing mothers who are not in a fixed space during a work shift and for comments regarding complying with the law when nursing mother's are located at a client's worksite. *Id.* at 80076-77.

Miller alleges there was no private space at the Roche Bail trailer other than the bathroom. Miller admits that she was able to lock the door to the Bail Bond trailer which

prevented anyone from coming into the trailer when she pumped and that she chose to use the bathroom because she believed the remaining rooms were video monitored. Alternatively, Miller alleges one of the office/storage rooms in the Roche Bail trailer was "cluttered" and therefore inappropriate as a place to express. Miller also alleges she was denied a place on September 8th after she resigned, because she was scheduled to work at the Roche Bail trailer during her day shift.

Because the trailer could be locked, the trailer as a whole should constitute as a place for purposes of the law and if there were private spaces anywhere in the trailer that Miller could have used then the Defendants should be in compliance with the law. Moreover, if storage spaces, manager offices, and closets can qualify as an appropriate place, and one of those spaces in the Roche Bail trailer was private and functional to express, then the Defendants would be in compliance regardless of whether or not there was clutter because clutter is not mentioned anywhere in the law. If there were any appropriate spaces available to Miller, her choice to allegedly pump in the restroom would be irrelevant.

### ii.    Location of Appropriate Place

Section 207(r)(1) and the DOL Fact Sheet are silent on whether an employer must provide an appropriate place at each building or location an employee may work. The DOL did not address the issue directly in its request for comments only stating it will not consider an employer in compliance with the reasonable break time if the space is "so far from the employee's work area as to make it impractical for the employee to take breaks to express milk." Nursing Mothers at 80076. There is no guidance on how far away the DOL considered too far.

Miller alleges she used the bathroom at the Roche Bail trailer when she worked as DMBB because there was no other private place in the trailer and she did not want to walk to her office at the Roche Surety building, which was only approximately a minute an a half walk away, because it was night time and it was close to the jail. Miller also alleges the Defendants refused to provide her a place on September 8th, when she was scheduled to work as an employee of Roche Surety.

If there is no requirement that an employer provide a place at each building or location, then the Defendants would have been in compliance with § 207(r)(1), regardless of whether there was a private place at the Roche Bail trailer, if taking approximately three minutes to walk round trip to the Roche Surety building would not have been so far away from Miller's work area at the Roche Bail trailer. Because the DOL was only concerned about the distance to the appropriate place for purposes of a reasonable break time, the time of day would not be relevant to the analysis.

### D.  Reasonable Break Time

The Court found an issue of material fact on the number of breaks Miller was allowed to take. (Dkt. 38). Section 207(r)(1) requires an employer provide a nursing mother a "reasonable break time" to express breast milk "each time such employee has need to express breast milk." The law does not define what constitutes a "reasonable break time" or a "need." The law also does not provide guidance for how immediate the break must be provided after an employee has a need or whether an employer is in compliance with the law if it provides its employees with discretion on when to take breaks and does not keep count of the number of breaks the employee takes. Moreover, the law does not provide guidance on

how an employer should handle shifts where a nursing mother may be the only employee working.

The DOL Fact Sheet states that the reasonable break time must be provided as frequently as needed by the nursing mother and that the "frequency of breaks needed to express breast milk as well as the duration of each break will likely vary." Similarly, the request for comment recognizes the inherent differences in nursing mother's expressing schedule and states the reasonableness of a break time will depend on a number of factors, including: time it takes to walk to the space to express; whether the nursing mother must retrieve her pump or supplies from another location; whether the nursing mother must set up her own pump or if a pump is provided; the efficiency of the pump used; whether there is a sink and running water nearby or any other additional steps that may be needed to clean; and the time it takes to store the milk. Nursing Mothers at 80075. Nursing mothers are encouraged to discuss with their employer what they expect they will need in terms of frequency and timing of breaks to develop a "shared expectation and understanding of what will constitute 'a reasonable break time' and how to incorporate the breaks into the work period." *Id*.

In the Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Miller, for the first time, alleged that the Defendants failed to provide her a break to express breast milk while she was covering the phones on September 7th, and as a result she suffered physical pain. The Plaintiff alleges her husband asserted her rights protected under the FLSA by writing an email complaining about the Defendants alleged failure to provide a break during her phone coverage. The Plaintiff, however, never requested

the Defendants provide her a break during phone coverage.  Indeed, the only time the Plaintiff requested a break or informed the Defendants about any needs with respect to the frequency and timing of breaks was in an email earlier that day requesting a break for September 8th.  The Plaintiff alleges she was not provided a reasonable break time on September 8th, because she was allegedly terminated or constructively discharged.

Roche Surety provided its employees two fifteen minute breaks that they could take at their own discretion as well as an hour break for lunch.  Its employees were also permitted to take additional breaks without requesting time from a supervisor. If an employer is in compliance with the law by allowing its employees discretion to take breaks, and the breaks provided enough time to express, then the alleged failure to provide breaks would be irrelevant because Miller could have taken the breaks whenever she wanted to and the Defendants would not have had reason to know she allegedly was denied a break. The alleged failure to provide Miller a break on September 8th should not be relevant because Miller was no longer employed by the Defendants and therefore could not have provided the break.

## V.     LEGAL ARGUMENT

Miller cannot carry her burden of establishing the Defendants: (1) retaliated against her for engaging in activity protected by the FLSA; or (2) did not provide her an appropriate place and reasonable break times to express breast milk at work.

### A.     Miller was not retaliated against for engaging in protected activity

The retaliation prong of the FLSA "prohibits an employer from 'discharging or in any other manner discriminating against' an employee because the employee has opposed or

complained about a practice that is unlawful under the" FLSA.[5] *Bythewood v. Unisource Worldwide, Inc.*, 413 F. Supp. 2d 1367, 1372 (N.D. Ga. 2006) (citations omitted). The FLSA only protects those employees who object to, or refuse to participate in, "any activity, policy, practice, or assigned task that the employee (or such other person) *reasonably believed* to be in violation of any provision [of this title]." 29 U.S.C. § 218c(a)(5) (emphasis added).

### 1.     Miller did not engage in activity protected by the FLSA

To engage in "protected activity," Miller must "file (or threaten to file) an action adverse to the [Defendants], actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards assertion of rights protected by the FLSA." *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1486-87 (10th Cir. 1996); *see also Claudio-Gotay v. Becton Dickinson Caribe, Ltd.*, 375 F.3d 99, 102-03 (1st Cir. 2004) (stating to engage in protected activity the plaintiff must go beyond mere "abstract grumblings" and take some action that is adverse to the employer). The complaint must be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the [FLSA] and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 131 S. Ct. 1325, 1335 (2011);[6] *see also Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1373-74 (S.D. Fla. 2009) (finding plaintiff did not engage in protected activity for purposes of retaliation because "nowhere in the plaintiff's vague statements to management," in which the plaintiff complained about including the sushi bar in the tip pool, "does the plaintiff assert her rights

---

[5] The parties do not dispute the prima facie case for retaliation under the FLSA or the burden shifting framework. (Dkt. 42 at 13-14).
[6] The sole question presented in *Kasten* was whether "an oral complaint of a violation of the Fair Labor Standards Act is protected under the Act's anti-retaliation provision." *Id*. at 1330.

under the FLSA"); *see also Etienne v. Muvico Theaters, Inc.*, 2003 WL 21184268, *18 (S.D. Fla. 2003) (finding the plaintiff did not engage in protected activity because he did not present "evidence that he threatened to report labor-law violations, or file a complaint about business practices" of the employer).

The portion of the FLSA at issue stands in unique position with respect to the requirement of a complaint because all other situations involving an employer's alleged failure to comply with the FLSA would actually involve a complaint by the employee of the employer's failure to pay minimum wage or overtime wages. The requirement of a reasonable break time and an appropriate place, however, requires the nursing mother actually make a request to receive the breaks and place, regardless of whether the nursing mother believes the employer is complying with the law. Unlike the Americans with Disabilities Act ("ADA"), which not only prohibits retaliation against one making a complaint but interference with "the exercise or enjoyment of, any right granted by [the ADA]," including a request for an accommodations, *see* 42 U.S.C. § 12203(b), the FLSA contains no such provision and therefore does not protect employees who merely exercise rights by making a request.

Miller did not engage in protected activity because she did not actually make a complaint of denial of rights protected by the FLSA. Indeed, Miller never mentioned the relevant portion of the FLSA in her September 7th email, even though she knew it existed and sent a copy of the law to a friend later that day. Nor did Miller's email allege that she believed the Defendants were engaging in unlawful employment practices or that she was allegedly at her breaking point because of issues related to pumping which occurred over the

previous two weeks. Additionally, Miller's email did not say she had taken or planned on taking some action adverse to the Defendants. Instead, Miller simply asked Roche where she could use her breast pump at the Roche Bail trailer on September 8th, the day after she resigned, and who would cover the office while she pumped at least twice during the day. This was the first time Miller informed the Defendants that she planned on expressing at work or of any needs she may have had with respect to this process. Accordingly, Miller's request could not be considered sufficiently clear for a reasonable employer, which did not know the law existed at the time and had already found information that Miller planned to resign, to understand as an assertion of rights under the FLSA and a call for protection.

Even if Miller can show her email was an assertion of rights, in order to engage in protected activity Miller must establish that she subjectively believed the Defendants were engaged in unlawful employment actions, and this belief must be "objectively reasonable in light of the facts and record presented." *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1134 (N.D. Ga. 2004). (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997)); *Bythewood*, 413 F. Supp. 2d at 1373 (same); *see also Clover v. Total System Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999) (stating to engage in protected activity the plaintiff must have a "good faith, reasonable belief" that the defendant's conduct is unlawful).

Miller cannot establish that she had a good faith, objectively reasonable belief that she was complaining of unlawful conduct in her September 7th email. The email was the first and only time Miller informed the Defendants that she was expressing at work and she admits she had not been denied any breaks and had been able to use her private office at

Roche Surety—the place she was hoping to use on September 8th—without making a request.  Even though Miller alleges she was walked in on two occasions, she did not believe it was necessary to inform Roche Surety about these occurrences nor did she inform them that her lock was allegedly not functioning properly.  Moreover, Miller did not think it was necessary to place a sign on her door or otherwise inform people she would be pumping in her office. Miller also did not think it was necessary to discuss with the Defendants other places she may be able to use.

Miller also could not subjectively or objectively believe the Defendants were engaged in unlawful practices for the times she allegedly pumped in the Roche Bail restroom when she worked as DMBB because Miller never told anyone she would be pumping during her shift and there were multiple appropriate places available for her to use which were not video monitored. Moreover, Miller had no entitlement to the protections of the FLSA because she was not an employee of the Defendants when she worked as DMBB and she admits she was fine with using the restroom.

### 2.    Miller did not suffer an adverse employment action after asserting rights protected under the FLSA

Additionally, Miller cannot establish that she suffered an adverse employment action after an assertion of FLSA rights because Miller's one-time request for a time and place to express breast milk was "too indefinite" to meet her burden. *See Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1339, 1343 (11th Cir. 2000) (holding a one-time assertion by appellant's counsel that appellant had claims under the FLSA or Wage Labor Hour was "too indefinite" to meet the appellant's burden that she asserted rights protected under the FLSA prior to her termination two weeks later). Moreover, Miller did not actually suffer an adverse action

because she resigned and she cannot show the conditions "were so intolerable a reasonable person would have felt compelled to resign rather than" remain employed. *See Burnette*, 342 F. Supp. 2d at 1138-39; *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (stating the threshold for establishing constructive discharge in the ADEA context is quite high and an employee's subjective feelings are irrelevant to whether the working conditions were so intolerable that a reasonable person would have felt compelled to resign).

Although Miller alleges she was at her breaking point because of the things that were occurring at work, she never informed the Defendants that she would need her window covered prior to placing the folders over the window, that her lock did not work properly or that two coworkers walked in to her office while she was expressing milk, or that she pumped in the restroom at Roche Bail. A reasonable person would not find the conditions were so intolerable and yet continue to pump at work without so much as informing the Defendants of the alleged intolerable conditions or placing a sign on her door for privacy. Indeed, without a prior request Miller would have no entitlement to a reasonable break time and appropriate place and therefore could not reasonably believe the Defendants were engaged in unlawful practices under the FLSA.

### 3. Miller cannot show her alleged assertion of rights was the "but for" cause of the alleged adverse action

Miller cannot establish that the alleged adverse action would not have occurred "but for" Miller's alleged assertion of FLSA rights. *Wolf*, 200 F.3d at 1343. Indeed, Miller admits Diliberto and Martin approached her because of her resignation letter and comments made on Facebook, and alleges these were the reasons for her termination or constructive discharge.

32

The Facebook comments were posted, and the resignation letter was drafted, prior to Miller ever allegedly asserting any rights under the FLSA and neither of these things had anything to do with her assertion of rights. Moreover, Diliberto and Martin did not discuss with Miller her email request when Miller decided to resign.

        **4.**      **Miller cannot Rebut the Defendants' Legitimate Non-Retaliatory Reason for Making her Resignation Effective Immediately**

The Defendants made Miller's signed resignation letter effective immediately, which was the standard practice for the Defendants, after she was approached because of her resignation letter, emails regarding resigning and alternative employment, and negative comments made on Facebook about the Defendants. Because these reasons would motivate a reasonable employer, Miller must meet them head on and rebut them by either "persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation was unworthy of credence." *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 823-24 (11th Cir. 2008) (citations and internal quotations omitted).  Importantly, an employer is permitted to terminate an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Abel v. Dubberly*, 210 F.3d 1334, 1339 n.5 (11th Cir. 2000). It is well established

> courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how high-handed its decision process, no matter how mistaken the firm's managers, the [FLSA] does not interfere. Rather, [the Court's] inquiry is limited to whether the employer gave an honest explanation for its behavior.

*Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).  It is therefore irrelevant whether Miller can establish that she did not actually post negative comments on Facebook

and that she did not actually intend to resign because as long as the Defendants' "believed" Miller did, and this belief was the reason the Defendants made Miller's resignation effective immediately, then there is no retaliation. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991).

Miller's husband had been pushing her to resign and soliciting alternative employment positions for over a week. Prior to the Defendants ever knowing about Miller's needs with respect to pumping, they received a phone call from Meyer informing them that Miller had been posting negative comments regarding the Defendants on Facebook, which were unrelated to expressing at work. It was at that time the Defendants decided to monitor Miller's work email and discovered multiple correspondences regarding Miller's intent to resign, including her resignation letter on the morning of September 7th, dated for that day, which was before Miller ever informed the Defendants of any expressing needs.

On the afternoon of September 7th, Miller was approached by Diliberto and Martin regarding her resignation letter, the emails regarding resigning, and Facebook comments. Miller told them she was not happy and signed her resignation letter, which was made effective immediately. Miller does not alleged any comments, actions, or inactions by the Defendants that would show the Defendants' refused to provide her a place and time to express or that they retaliated against her for making the request on the afternoon of September 7th rather than complying with it.

### B.     Miller cannot Establish she was Denied a Reasonable Break Time and Appropriate Place to Express Breast Milk at Work

Miller has failed to establish the Defendants violated the FLSA by denying her a reasonable break time and appropriate place to express breast milk at work. *See* 29 U.S.C. §

207(r)(1).  Miller failed to provide the Defendants notice of her intent to express or the timing and frequency of any breaks she would need. Miller also did not speak with the Defendants about any places she could use to pump and decided to use her office on her own even though the Defendants had multiple places which were shielded from view and free from intrusion that Miller could have used.

In fact, Miller does not suggest that her office, with the sidelight covered, would not afford the privacy required for expressing her milk.  She engaged in that activity twice a day for every work day on which she was at work until her resignation was accepted, with no impediment except the two instances on which she alleges co-workers walked in on her.  All agree that Miller's office had a door lock.  She tested that lock and it worked, except for the two times when the co-workers walked into her office while she was pumping.  She did not inform anyone of the supposedly non-functioning lock, nor did she place a "do-not-disturb" sign on her exterior door. Thus Miller cannot show that she was denied a private place within which to express milk.

When she was working at Roche Bail as her own private bail bond company, she was not an employee of Roche Surety and she does not allege an entitlement to a place for expressing milk during that time. On the one occasion on which she alleges she worked at Roche Bail as an employee of Roche Surety covering that office, she did not need to express milk because the shift was only two hours long. Even if she had, she had more than enough space to do so.  Roche Bail is located in a double-wide trailer used as its offices. There is and was at least one room which was not monitored.  Miller knew this to be the case because the cameras' images were displayed inside the office and she had access to that monitor. Miller

says the office was cluttered. Clutter is not mentioned by the DOL as an issue with compliance. Miller also could have used her office or another space at Roche Surety by calling over and having a co-worker at Roche Surety cover the Roche Bail building for her.

The only time Miller alleges Roche Surety refused to provide her a break time was on September 8th, when Miller was scheduled to work at the Roche Bail trailer, but she resigned before the Defendants could have complied. During this shift Miller would have been an employee of Roche Surety and would have received her hour break for lunch and two fifteen minute discretionary breaks. Miller was also permitted to take additional breaks, and the breaks provided Miller more than enough time to pump because she claims she only had to pump two times during the day for ten minutes each time. Indeed, she apparently had ample time at work to express milk because she does not claim to have ever been denied that time or docked in pay for taking it. Miller also alleged, for the first time, in her opposition to the Defendants' motion for summary judgment that she was denied a break on September 7th during her phone coverage. Miller did not request a break during her phone coverage and would have been free to take a break at her own discretion.

## VI.    CONCLUSION

Based on the foregoing legal arguments, the Plaintiff will be unable to prevail at trial.

Respectfully submitted this 28th day of November, 2011.

/s/ Thomas M. Gonzalez
Thomas M. Gonzalez
Florida Bar No.: 192341
Nathan J. Paulich
Florida Bar No.: 0085190
Thompson, Sizemore, Gonzalez & Hearing, P.A.
One Tampa City Center

201 North Franklin Street, Suite 1600
Tampa, Florida 33602
Telephone: (813) 273-0050
Facsimile: (813) 273-0072
tgonzalez@tsghlaw.com
npaulich@tsghlaw.com
Attorneys for the Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been

furnished on this 28th day of November, 2011, by CM/ECF electronic filing to the Clerk of

Court and to the following:

Luis A. Cabassa
Wenzel Fenton Cabassa, P.A.
1110 N. Florida Avenue, Suite 300
Tampa, FL  33602


/s/ Thomas M. Gonzalez
Attorney